The Honorable Judges of the United States Court of Appeals in the 4th and 7th District Circuits, hear ye, hear ye, hear ye, all persons present before this honorable court are admonished to draw near and give their attention as the court is now sitting. The Honorable Judges of the United States Court of Appeals in the 4th and 7th District Circuits, hear ye, hear ye, all persons present before this honorable court are admonished to draw near and give their attention as the court is now sitting in the United States and in our court. Good morning ladies and gentlemen. Our first case for this morning will be James Garbe v. Kmart Corporation. Ms. O'Neill. May it please the court, Kathryn O'Neill on behalf of Kmart Corporation. Your Honors, the relator James Garbe in this case had six years to gather evidence that Kmart violated the False Claims Act by submitting allegedly inflated prices on behalf of beneficiaries who were covered by the Medicare Prescription Part D program. He failed to do so and he now comes before this court and asks this court to excuse his failure of proof by essentially rewriting the False Claims Act. Rewriting it in a way that would allow it to extend to conduct where the relator has not provided any evidence that the government did or even could have paid a single penny more. Why is that relevant after the 2009 FIRA amendments? The government paid through this chain that goes through from the pharmacy to the benefits manager to the plan to CMS. There's no doubt that this is government money. So where's the presentment requirement after 2009? Your Honor, as an initial matter, I would say that it really is not the case that there's no doubt that this was government money. There certainly is a chain that applies here and the relator has essentially asked this court to take judicial notice of that Medicare Part D structure. What part of the structure do you think was not followed? What did, what relator has utterly failed? No, no, what part of the structure do you think didn't happen? You've described in your brief the way this moves up with CMS essentially capitating the plan sponsors and then the private plan benefit managers. There are lots of acronyms in these briefs, but the PBMs, and then they pay the pharmacy. So putting to one side whether Kmart, whatever the price was, what reason is there to think that Medicare Part D wasn't operating properly? Your Honor, under this court's precedent in Cruz, I would suggest that the relator has been unable to show that there's actually a dollar, even one dollar on one claim that actually flows from the government in this case down through Counsel, does the relator have to prove the way Medicaid D works? What the relator has to do is to come forth with credible evidence that would allow a jury to find that they have satisfied the essential elements of a claim. That doesn't really answer my question. That doesn't answer Judge Hamilton's question at all. Why can't the judge simply explain to the jury how Medicaid Part D works? And the assumption is that that's what happened unless somebody has some contrary evidence. What's wrong with that? Because there has to be some causal link here, Your Honor, between the dollars that actually ended up in the hands of Kmart and the government. But that's what Judge Hamilton is saying. Medicare Part D is a highly regulated program, let's just say, and you don't contest that Kmart submits claims to the pharmacy benefit managers and that they submit claims about prescription drug events to the plan sponsors and that the plan sponsors, this is all in regulations. It's in the statute. So you must be arguing either that the statutory scheme has broken down and that somehow something amiss is happening such that the government isn't really paying these claims. Because there's just a legal structure in place that shows how the claims flow. There's evidence in the record to show how much is direct appropriations versus, and it's all commingled funds, versus sort of subscription amounts. I don't understand why you think this, it's odd to me that you're focusing on this as a point that you're trying to make. Part of the reason for the focus on this, Your Honor, is that this is a motion for summary judgment, not a motion to dismiss. No, no, no, no, no. I mean, you have various arguments. Of course it's a motion for summary judgment. I totally understand that. But they've shown how the program works and that what Congress decided to do with Part D was enlist various private intermediaries. But it's a government program. People stand on the floor of Congress all the time and complain about how much money is being funneled into pharmacy benefits. Are you taking issue with reports from the Department of Health and Human Services about how much money is going to pharmacy benefits? We're taking issue with the fact, Your Honor, that Kmart in this case is essentially a sub-subcontractor. Exactly. That's why I want you to go over to presentment. It is absolutely true that Kmart is not sending a bill to the Department of Health and Human Services or to CMS and saying, please pay us. There are various intermediaries, and I think it would be more fruitful for you to talk about whether that makes any difference, and in particular in the post-2009 world, whether that makes any difference. It does make a difference, Your Honor, because the essence of the False Claims Act is that liability attaches to the submission of the false or fraudulent claim. And so they must establish there's a claim. I thought the essence of the False Claim Act was that the government was paid, either directly or indirectly, was paying money that it shouldn't have to pay. That is correct. And that's why the definition of a claim, even after the FERA amendments, directly encompasses the idea that there is some payment of money flowing from the government. So the definition of a claim includes a demand for money submitted directly to the government or a demand for money that is submitted to a And haven't you just described Medicare Part D? I'm not following why that isn't exactly what happens, that there are contractors, private entities, that stand between KMART and CMS or whichever, we'll just call it CMS, and they're paying. KMART isn't giving the drugs away to people. It's getting paid, and it's getting paid because it has submitted these claims to the contractors. It has, Your Honor, but what we don't have is the evidence of exactly how those contracts work. So there is money at the top of the pyramid. It is doled out according to a contract with the plan sponsor. That government money is then paid to a PBM for a number of different services, which admittedly include the payment of prescription drug claims, but include call centers and formulary management and a number of other things that PBMs do. We don't know anything because Relator chose not to get the evidence about how that... Why does it matter? The government doesn't even have to pay the full claim. The language of the statute suggests that the government sort of contributes to. I don't have the exact language right in front of me, but the government has to just pay part of it, essentially. It does, Your Honor, but in this case, the Relator has not even shown that. They are essentially asking the court to take judicial notice of liability in this case. To repeat Judge Hamilton's question, why can't the court take judicial notice, your phrase, or just looking at the Code of Federal Regulations, I would think, to see how Medicare Part B works? Your Honor, there has to be an impact on the government somewhere. Why? Why? Why? Because... The statute seems to say it's enough if federal money is paid. It doesn't seem to say there has to be a marginal payment, right? When I read this statute and your brief, put me in mind of 18 U.S.C. 666. You know that statute? It makes criminal certain activities involving any recipient of U.S. funds. If you pay a bribe to somebody who receives U.S. funds, you can go to jail for a long time, even though the government is not net out-of-pocket. The federal funds define the scope of culpability, and it looks like the False Claims Act, after the 2009 amendment, works the same way. Now, maybe that's wrong, but you need to explain why it's wrong rather than just assert your bottom line repeatedly. Your Honor, we would assert or argue that it is wrong because even post-FERA, the Senate Post-Fraud Enforcement Recovery Act... Why don't you say the 2009 amendments? The 2009 amendments. You may know all these acronyms. Specialists may know them, but we're generalists. Yes, Your Honor. Post the 2009 amendments, the Senate report in connection with those amendments still refers back to... We don't ever start with Senate reports. We start with the language of the statute. Do you have an argument based on the language of the statute? Yes, Your Honor. The language of the statute in defining a claim post the 2009 amendments specifically requires that the request or demand for money be made to a contractor if the U.S. is going to provide any portion of the money demanded. And what we say is that here... And it doesn't say, and this has to increase the total amount paid out of the Treasury. No. It just says if the U.S. is going to provide any part of the money. But the relator has not shown how that money flow works. The relator has asserted... So we're just back to the proposition that it is somehow a matter for evidence how the Medicare claims system works. It is, Your Honor. You don't find it by looking in the statute or the Federal Register, according to you, what? You have to put the Secretary of Health and Human Services on the stand to testify about how it works? No, Your Honor. But at least you would have to provide one contract with a plan sponsor and a PBM that says, this plan sponsor receives a certain amount of money from the government. That plan sponsor has an arrangement with the PBM. Here's the contract. What's wrong with... It shows that... Counsel, what's wrong with just saying, here's the claim that Kmart submitted to the pharmacy benefits manager, and here's the payment that it received in return. There's no doubt it was a Medicaid Part D claim, and as far as anything upstream goes, we'll just assume that the law was followed. Because we can't assume that on summary judgment, Your Honor. You can assume that the law was followed. Maybe I could shift you to a different topic, Ms. O'Neill, and that's the question of the retroactivity of some of the 2009 amendments. If I understand your position, the 2009 amendments application would depend upon the date a particular payment was actually made by the government or the contractor, correct? That's correct. So that if we had two claims for payment that are submitted fraudulently, each submitted, let's say, on June 1st, 2008, one is paid on June 6th, the other is paid on June 9th, one is subject to the 2009 amendments, the other is not, under your position, correct? That would be our position, yes, Your Honor. Why on earth would Congress have done that when the 2009 amendments were aimed at essentially erasing Allison Engine from the books, while leaving intact closed judgments that Congress can't constitutionally reopen? Your Honor, because they were trying to erase Allison Engine as of June 7th and say that on June 8th, 9th, 10th, anything that happens there is not affected by that decision. But they were not trying to rewrite history of how things stood before Allison Engine. They weren't? They were not. Where do you get that from? I thought that was the whole game. To the extent, as you say, they constitutionally could. But the other problem I have with your retroactivity argument is that it seems to think that claims for reimbursement are submitted under the False Claims Act, and claims for reimbursement are not submitted under the False Claims Act. They're submitted under Medicare, or they're submitted under Medicaid, or whatever other, TRICARE, whatever other program. So you have an uphill battle, I think, when the language of the amendment is claims submitted pursuant to the FCA, False Claims Act. Your Honor, we would argue that under the False Claims Act is there to make clear that the definition of claim is the one found in the False Claims Act. That's not what it says, though. It says claims submitted under the False Claims Act. Not submitted, Your Honor, just claims under the False Claims Act. Claims under the False Claims Act. So why is... There is no claim. You don't say, please let me have a false claim. It just doesn't make any sense. It doesn't say claims as defined by the False Claims Act. It doesn't say anything. It just uses this word, which we've observed before. It's a somewhat ambiguous word. A claim can be what you're saying. A claim can be a case. Failure to state a claim upon which relief can be granted appears in Rule 12b-6. So the word claim means a lot of things. We have to look at the context. Yes, Your Honor. But in this case, the retroactivity provision is not codified in the United States Code, and therefore the reference to under the False Claims Act would direct the reader specifically to the fact that the definition of claim that Congress was intending was the definition of claim under the False Claims Act or defined in the False Claims Act. Why would it do that? It would do that, Your Honor, precisely to get to the point that Judge Hamilton raised, which is they were trying to wipe off Allison Engine on the books, and therefore if there are claims that are still existing and are still active and that are subject to be paid, they do not want Allison Engine to apply to any of those claims. And so by saying that we are focusing on the requests or demand for money as defined under the False Claims Act, those are the claims that are going to be subject to our change in the law. Could I ask you about your approach to the definition of the usual and customary prices? And can you direct us, Ms. O'Neill, to what the record shows us about how many people actually pay what Kmart says is the usual and customary price and how many people pay what the relator says under the discount membership arrangements are usual and customary prices? The record is admittedly unclear on that, Your Honor, which is part of the reason why we would say the District Court could not have granted summary judgment for the relator on this point. But there are, I guess, two pieces of evidence that are in the record. First of all, there is a statement by the relator's expert, Dr. Hay, in his expert report, which the district judge cites in footnote 10 of her order. And that report says that there are 90 percent of the customers over the entire period. This is an average. This is not in any given year. Actually, Professor Hay said that the sales on the discount program represented 99 percent of all sales. He did originally say 99, and then at his deposition, he corrected that and said that he had made some errors and that it was 90 or maybe 80 or at least 70. He said he was very confident that it was the high 70s or higher. Yes, Your Honor. Is there any contrary evidence? Well, first of all, it's important to note that what that says is that Is there just quickly a quick answer to Judge Easterbrook? The contrary evidence would be the declaration of Jason Duke's, which was submitted as well, and which is at page 3036 of the record and paragraph 6 of that declaration, that says that not every customer paid the price. That's not evidence contrary to the proposition that 70 percent or 90 percent or 99 percent did. It's just a proposition that out of a very large number of sales, at least one customer did not pay the discount rate. So I ask again, is there any evidence contrary to what Professor Hay found or said? There is no evidence directly contrary to that, but that evidence also does not measure enrollment. So what are the factual issues that you think are relevant to this question, and where did you identify them for the district court? Your Honor, the factual issues would potentially be the enrollment aspects of Kmart's program. Now we did not identify them. What does that mean? That is the point, Your Honor, on how exactly enrollment occurred. Was it by a form? Why is that relevant if we know the bottom line of how many people, quote, enrolled? And I'll let you answer that question, and I just have to say looking at this program reminds me of countless retail measures to give essentially discounts to certain people, whether it's Amazon Prime or whether it's your Barnes & Noble card or whether it's your card for the grocery store that gives you some discount. I mean, this is not an uncommon business model. It is not, Your Honor. It's similar to a BJ's or a Sam's Club where you have to enroll in their club to get the price. Or Amazon Prime. Right, so anyone in the public who wants to. And actually, here's another point. I gather this was $10, right? So if you factor the $10 in, even the first prescription is cheaper. So why would anybody not enroll if they know about it? Well, Mr. Weber in his deposition, which is in the record, indicated that you're joining a program, and this is at page 106 of his deposition, that you're joining a program which, not post-HIPAA,  could subject you to marketing, could mean that Kmart has your information, and some people just don't like to do that. HIPAA has been in the law for a long time, so I'm not sure that's a decent argument. So there is a difference, we would say, in the price charged to the general public and the price offered to the specific people who choose to enroll in the program. And so our argument was, if the relevant issue here for UNC is whether or not Kmart charged that price to the general public, it did not. It offered that price only to the people who chose to enroll, whether it be, going back to your question, Judge Hamilton, through verbal enrollment, online enrollment, or other types of enrollment. The court would have to find that there was enrollment. We said the facts show that. The relator disputed it. So at the least, there could not be a grant of summary judgment. You fill out a form. What difference do those details make? You need a dispute of a material fact. What's the material fact, and why is it material? Well, a jury might find that that's material, Your Honor. That's not how we assess material. What's material? That you have to actually fill out a form and go through a process to enroll. When we know the bottom line is that it's undisputed that at least three-quarters of the business is handled through those membership discounts? Again, that is across the ten years in the aggregate, not in any particular year. Did you come forward with detailed information to dispute that number in a particular year? We did not. When did you identify these supposed factual issues for the district court? We identified those issues. Dr. Hayes' deposition was taken approximately three or four days before the summary judgment argument, and we identified those factual issues and what he said in his deposition to the district court. In the oral argument on the hearing? So we're not going to find a document that identifies these are the disputed issues of fact? They are not, Your Honor, because the question that the district judge decided and granted summary judgment on was not the issue that we had moved for summary judgment on. That's not the point. The plaintiff did move for summary judgment, right? The plaintiff did not move for summary judgment. She granted it sua sponte, and the issue we were arguing was that this is an enrollment program. The facts are undisputed that there is enrollment, different types of enrollment, but undisputed that there is enrollment, and the relator came forward with no evidence to dispute that. They just simply said the enrollment process was not sufficient or good enough. The judge then made a determination... In this instance, it doesn't cause the conclusion that these are not members of the general public such that usual and customary can apply. I don't think anybody was complaining whether this nominal enrollment where you give your name and address and all the stuff that you have to give anyway to the pharmacy, plus maybe pay $10, you know, so that you can get a $60 prescription for $15. So I don't think that there was much of a reason to dispute these facts. And the district court's decision turned on the fact that we didn't discriminate in allowing people to join. The fact that we allowed anyone to join automatically as a matter of law turned our pricing to the usual and customary price. We said that it was not the price to the general public. Could I follow up on, if I could, on one topic? These so-called private clubs were obviously for a number of years a way of evading desegregation orders in the South and elsewhere in the Civil Rights Movement. And in your brief, page 44, note 13, you point out a whole lot of different factors had to enter into those judgments. I went through those factors. Genuine selectivity, we don't have that here. Memberships control over operations of the establishment. You don't give your customers control over Kmart. History of the organization. It's just the discounts. Use of facilities by non-members. Well, of course everybody gets to do that. Purpose of the club's existence. Whether the club advertises for members and whether the club is profit or non-profit and formalities observed by the club. I realize the district court didn't go through those factors, but how on earth do they favor you? Your Honor, first of all, we would argue that they're not relevant because we're not trying to determine whether Kmart could have discriminated against who could join its club. We are simply saying that once we in fact have a loyalty club, is that group who has chosen to join the general public such that the price we charge them is our price to the general public? But the purpose, I think, the purpose of this loyalty club would be one factor that would cut in our favor. It's to offer prices to a less than the entire cash-paying public. And secondly, the use of it by non-members would also be a factor that would favor us because we would argue that there are people who do not get this discount price and in fact pay the same usual and customary price that was ultimately passed on to the government. If I could, with my colleague's indulgence, ask one more question before you conclude, Ms. O'Neill. I'd just like to ask you on the question of materiality, I didn't see a response from you all to the Relator's point that at a minimum, the false statements were capable of influencing Kmart's receipt of money or property. Yes, Your Honor. This would go back to our argument that that money needs to be money that has flowed down from the government. And the Relator has not given any evidence that would suggest that the money Kmart received was government funds. We don't know... Except that it was Medicare R.D. Except that it is paid to a sub-subcontractor within a government program and there's no limiting principle to that, Your Honor. Thank you. Thank you, I appreciate your time. Thank you very much. Mr. King. Counsel. May it please the Court. The District Court's denial of summary judgment should be affirmed for five reasons. First, Kmart submitted approximately two-thirds of the Part D claims at issue here after Congress amended the False Claims Act in 2009. So this part of your argument is, as I understand it, obviously, I know you're going to address the retroactivity issue, but you're saying that there's a substantial bit of the case that isn't affected one way or the other. Correct. Okay. Correct. Under the post-2009 amendments version of the False Claims Act, presentment to an officer or employee of the United States government is not an essential element of an A1A claim. Post-2009 amendment, presentment of a false claim to, quote, a contractor, grantee, or other recipient, end quote, of federal funds, if those funds are, quote, to be used to advance a government program, end quote, is sufficient. So the case I think that Ms. O'Neill was trying to move us up to for distinguishing is what's the difference between the money that flows down to Kmart on the one side and the money that I get from the federal government once a month, and then I go out and spend it as I wish. Certainly, the people who I patronize are not people who are benefiting. I mean, they are benefiting from federal funds to the extent that I've decided to spend some money there, but what's the difference between those two cases? The difference is a couple of things. Of course, the Supreme Court and the Allison Injun decision in 2008 didn't see a difference between those two things, but when Congress amended the False Claims Act in 2009, it amended the definition of a claim to include the language that a claim to a contractor, grantee, or other recipient of federal funds, if those funds are to be used to advance a government program or interest, that distinguishes it from the paycheck you receive each month because you receive that money. It becomes yours for you to do with as you please. How about let's change it from personal salaries, which are addressed in the statute, to contractors' payments, and let's say I run a highway contracting business and I've got a sub-subcontract on it for a partially federally funded highway project, and it turns out we've got some electrical problems in our office and we bring in an electrician to fix them, and that electrician submits a false bill. Is that covered by the False Claims Act? It is now. It wasn't in the wake of Allison Injun. Obviously not, but you think it is now. Yes, and the reason is because that's exactly what Congress intended to wipe off the books, Allison Injun. If a contractor of federal funds, a contractor or other recipient of federal funds, a claim made to a contractor or recipient of federal funds, if those funds are to be used to advance a government program or interest. They're being used to repair my office where I manage a number of contracts, including a federal government-funded contract. Maybe I misunderstand your hypothetical. So I'm wondering whether you're trying to say that once the funds go to the contractor to build the highway, let's say, that you somehow have to keep a chain of custody for the funds so that those dollars go only to the highway. That's one option. Or once that person receives those funds, as long as they're working on the highway project, anything they do, whether it's office overhead, whether it's buying snacks for your office staff, whether it's buying concrete for the highway. So I guess there are two ways of looking at what happens once you get those federal grant dollars for the highway program. Well, using the facts of Allison Injun, the request of the subcontractor to be paid by the contractor, the shipbuilder, that is a false claim because it is made on a contractor who is in the possession of federal funds that are to be dispersed, used for a federal program to build a ship. So the question would be is the office repair of the electrical system part of the federal project, or does it have to be actually more directly money spent on the highway? How broad is this is the issue, obviously. I'm not entirely sure that I understand the hypothetical using the office example. Because it's a general benefit to the contractor. You'd have to fix your office even if next year you don't have the highway contract anymore. Right. General overhead, so to speak. The general contractor's business office, and it's not a government employee or officer. Is that the hypothetical? The electrician submitting the fraudulent bill may or may not have any idea that any federal funds are involved with his customer. Right. Well, if I understand the facts that you're proposing correctly, those funds aren't being used to advance a government program or interest. So that's the key statutory language to provide a limitation, as you understand it. I think the language that Congress adopted in 1986 and the language that it then tweaked in 2009 are both crucial here. Because the language in 1986 defining a claim also said that a contractor, grantee, or other recipient of federal funds, a claim on a contractor, grantee, or other recipient of federal funds, is a claim within the meaning of the False Claims Act. All right, so let's vary the hypothetical. Suppose Kmart submits its view of usual and customary charges to Blue Cross, which is administering an employer's welfare plan governed by ERISA. Is that within the scope of the False Claims Act? No, I don't think so. Because in that instance— The employer is going to deduct on its tax return every penny paid as part of this welfare benefit plan. Right, but— There's a definite tax benefit. And, of course, economists always refer to tax expenditures. Right. But where would the claim be in that situation on federal funds? The government program is the tax expenditure designed to subsidize employer-provided medical care. It strikes me, and I'm not sure that I can articulate the reason right now, that that is a bridge too far. But I don't think it's necessary— That's one reason why we ask hypotheticals, to see whether you can articulate the limits on your theory. And every time courts have tried to draw a limit, Congress has said, no, we actually mean you to go over that bridge. In the context of the False Claims Act, that has been true often. But the difference, I believe, is that when you're talking about a subsidy of that sort, a tax break, you're not talking about federal funds that have flowed from the general treasury, the U.S. Treasury, or any one of the government's accounts, to a contractor, grantee, or other recipient. And that's essential under the definition of a claim. That was essential to a definition of a claim under the 1986 version of the statute. It's still part of that statute, which adds that those funds that have to flow from the government to the to advance a government program or interest. And it seems to me that the ERISA hypothetical that you proposed just simply doesn't match that language. I have some difficulty seeing why a tax break is not a government program designed to advance a government goal. And of course, if you really want me to press the hypothetical, I would say, suppose this becomes the basis for a refund application, and the government sends a tax refund check to the employer as a result. A tax refund would not be federal funds put into the hands of a contractor, grantee, or other recipient for the purpose of those funds being used to advance a government program or government interest. No, you could argue that a tax refund is just the government giving back the money to you that it shouldn't have taken from you to begin with. Let me ask you a different question. Is it necessary, in your view, for us to worry about whether these intermediaries are the government if we were to agree with you on the retroactivity point? Because it does strike me that the statute draws a distinction between things that are the government and things that are contractors or subcontractors or sub-subcontractors. That's right. Unfortunately, I think it is an issue that you will have to reach because the Part D program began on January 1, 2006. So there's a period of time, even if you found the former A2, to have been effectively amended on June 7, 2008, and to apply to cases going forward from that date, you would still have the period... There's still some... How many of your claims fall in this early period? I'll follow up. Go ahead and answer that. You wouldn't have to deal with the Allison Injun problem, the Allison Injun interpretation, but you still have to deal with the language of the statute, which with respect to Section A, the A1 claim, the former version of the statute, required presentment to an officer or employee of the United States government. Now, does it say presentment or presentment or caused to be presented? Presentment or caused to be presented. So how do you interpret the latter phrase? Caused to be presented? Right. Well, two ways. There are two different kinds of false claims at play here, and we have been focused... This appeal has caused us to focus on the false claims that KMARC submits to plan sponsors and pharmacy benefit managers. But as counsel has pointed out, the PDEs, the documents, the prescription drug event, the documents that are created when a party claim is paid... I can't put that language. Is it your fault? Is this language something that Congress created, a pharmacy drug event or some such thing? Yeah. I don't recall whether that one is a statutory term or a regulatory term. But it's not yours. Correct. I'm hoping. Yes. Okay, good. The prescription drug event is a document that is created electronically that... That means that a party claim was paid. So somebody goes in, they get their blood pressure medicine or something, that's a prescription drug event? Correct, and that's forwarded on to CMS. And we maintained, and this has not been an issue in the briefing or on appeal, but in the district court, when we were addressing this argument, we argued to the court that the PDE is a claim, it is a false claim. And the reason that it's a false claim is because it reports what the planned sponsor or pharmacy benefit manager paid on a particular prescription. Can I ask you this? In this massive paperwork that goes to all these different people, I take it there is some place, perhaps just when Kmart is saying to the people next up the chain, the pharmacy benefit manager, here's how much money we want from you. Somewhere the usual and customary figure must come in. Which piece of paper does it show up on? It does. It's actually not paper. It's all electronic these days. It is a field in an electronic form. It actually has a designation. It's called 426DQ. It is the usual and customary field that is filled out. And what Kmart filled out, what Kmart put in 426DQ, the usual and customary field, was the amount that it claimed as its usual and customary charge. And that was just the cash customers who were not in the program, right? It's not the people who have insurance and so on. So it's already a subset as I understand it. Right. It was the price that almost nobody ever paid. And that's what Kmart claimed was its usual and customary charge, even though nobody usually and customarily paid that amount. And that's where that number appeared. There might be some insane people who usually and customarily did pay. Pardon me? There might be some people who usually and customarily did pay. We would just call them insane. Correct. Sadly mistaken, perhaps. Could I take you back to follow up on Judge Wood's question? On this, if we agree with you on the retroactivity of the 2009 amendments applying to pending cases, he said that would still leave some of your claims pre-2009 subject to a statutory presentment requirement. Is that right? Yes. Okay. Are any of those claims solely under A-1, or would the same claims also be deemed false and actionable under A-2? Well, the language of A-2 was that a false statement that was used to get a false claim paid or approved by the government, that was still the language. Now, I suppose the easy answer to that is that with Congress's overruling of the Allison Engine case, at least with respect to the A-2 claim and wiping it from the books, that that argument simply can't be made with respect to an A-2 claim, although then you have to deal with the fact that it strike that. With respect to A-2, there's no problem. With respect to A-2, there's no problem. It's only with respect to A-1 that there would be a potential problem. I understand that. My question is whether there are any parts of, I mean, dollars in the relief you are seeking that depend upon an A-1 presentment element if we agree that the 2009 amendments are retroactive. If you agree that the 2009 amendment, one provision of the 2009 amendments, it's the one that amends A-2 and makes it A-1B. Got it. Then everything is covered with respect to the A-2 claim. If you find that that retroactivity provision applies to cases or another way of looking at it is to A-2 claims that were pending on or after June 7, 2008, yeah, that covers all of the A-2 claims. So what else is there? There's the A-1 claim, but it's not necessary. Okay. What I'm trying to get you to tell me is whether A-1 is redundant, in essence, as applied to those claims. In the context of this case, I think it would be redundant. It is the belts and suspenders approach of lawyers to include A-1 and A-2, or I should now say A-1A and A-1B claims in cases, and it can make a difference. So A-1A is the old A-1 and A-1B is the old A-2, is that right? That's correct. I've got to tell you, I find it difficult to understand how this amounts to, I have some sympathy with the Supreme Court's textual analysis, and with presentment requirements under A-1, but also Congress has made its views reasonably clear. Well, I think with the 2009 amendments, A-1A and A-1B are even closer together than they were, but the A-1B claim, the old A-2 claim, requires the use or making of a false statement or record to get a false claim paid. You know, it's not always the case that a false claim will involve a false statement or false record. Is there a specific intent requirement for A-1B? Specific intent is not required under the statute. Just general fraudulent intent? Yes. Okay. All right. Is there anything else you'd like to say about this usual and customary thing? I mean, there is minimal, though the burden may be, some process whereby people, I mean, today I would say if you were to sign up for a program like that, it's most likely that you'd be inundated with e-mails from KMART or whoever's program it was, but maybe that wasn't the case back in 2000, back when these programs began. Yeah. There are a couple things about that. The enrollment that KMART talks about in this context, it really is, as you said earlier during the argument, that the enrollment consisted of providing the kind of basic demographic information that a customer would have to provide to get his prescription filled anyway. So is there any evidence that the fee was ever more than $10? No. In fact, there is evidence. I'm not sure that it's in this record. First of all, there wasn't a fee in 2006, 7, 8. In 9, KMART started charging the fee. However, not really, because with one hand it took the $10 fee, with another it gave a $10 coupon back to the customer,  and those dates are somewhat curious because this case was under seal in 2009, but the government was investigating the claims, and it served a subpoena on KMART. The timing is curious. It suggests to us, at least, that KMART started charging the fee but giving it back to the customer in the form of a coupon because it knew something was afoot and the government was looking into its program. After this case was unsealed, then, in 2010, late 2010, in 2011, KMART decided we better quit giving that coupon back and make it a real $10 fee. So the evolution of how that fee came into existence in this case is interesting because I think it demonstrates between that and the enrollment, which is not really any enrollment. In fact, one of KMART's own witnesses testified, I believe it's in one of the footnotes in our brief, that there really is no difference between saying, I want to enroll in the program and I want a cheaper price. The only reason that KMART says this is a club, which, by the way, is not what it said for many years and when it would justify not giving discount prices to other third-party payers, it got inquiries from private insurers, it got inquiries from Michigan Medicaid, and it just lied about it. In the early years, it was telling private parties, third-party payers, that it was a secondary insurance program. All of KMART's witnesses have testified in this case, this isn't insurance and, of course, it's not. So the only reason there is a quote-unquote club, the only purpose of the club is to allow KMART to charge the government and private insurers as well, because this practice is across the board, to charge them a higher price, to charge the customer. What you're saying essentially is it's a price discrimination mechanism because it wants the club to compete with Sam's Club or Costco or Walgreens for all I know, I mean, others that have similar prices. There's some evidence I remember reading about that. But on the other hand, if you can price discriminate, you can charge some people a higher price. Well, and that's exactly what they've done, is to charge the $5, $10, and $15 in order to compete with the Walmarts and Targets and other Walgreens of the world, while at the same time trying to maintain a usual and customary price that it can charge to when there's insurance involved. When there's a deep pocket to pay, the price is always higher, many times shockingly higher. And by the way, the dire claims about what this means for the industry, if it's the law, I don't know that that should make any difference anyway, but it's not true. I mean, they got one company to sign on to their amicus brief, and Walmart doesn't do this. The CMS holds out Walmart as an example of the company that does it right. It charges $4 for its 30-day prescriptions, and when there's Part D insurance, it charges the customer a $1 copay, and Part D pays $2.50 on that. So, you know, it's not true that everybody's doing it. It's not true that there are dire consequences for the industry. There are companies who are doing it right. At one point that I would like to address as quickly as I can, it's not true that we have not put together evidence in this case about how the Part D program works, aside from the fact that, as you have all pointed out, that this is something the court could take judicial notice of, it could read the law, it could instruct the jury on how Part D works. We have a witness, a witness who has over 25 years of experience in the PBM industry, pharmacy benefit management industry, and the last 18 years her firm, Pharmacy Outcome Specialist, has provided a variety of services, including to the Department of Defense and the Office of Personnel Management, having to do with these very kinds of issues. And she, in her report, which is in the record at CCF number 218-9, at pages 6 and 8 of her report, she lays all this out. We do have a fact witness. Now, I suspect when we get ready to go to trial, there will be a motion in limine that says she's testifying to issues of law, but we've got it covered one way or the other, because we have unimpeachable sources, for instance, the Medicare Trustees Annual Reports, the HHS reports of the Office of Inspector General, all of which are unimpeachable sources. Okay. I see my time is up. You're out of time, but thank you very much. Thank you, Your Honor. And you ran out of time. If you want and will promise me one minute, I will let you make a final point. Your Honor, even if the Court were to agree on the retroactivity point that A2 applies, those false statements must be material to the false or fraudulent claim, and the claim is the thing that is paid for with money from the government. And so we would argue that you still need to address the materiality point across the board. The evidence that Mr. King just referred to is evidence that lays out, again, the hypothetical structure of the Part D program. The witness, Dr. Hayes, does not, as opposed to Dr. Hay, it's Ms. Hayes, does not provide any evidence of the amount of money from the Federal Treasury, does not provide any evidence about what percentage of that money might go to a PBM, a pharmacy benefit manager, particularly for the provision of pharmacy, reimbursement of pharmacy claims versus the other services, certainly does not testify and provide any evidence on the portion of that money that actually goes to pay a claim submitted by KMART. Okay. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.